**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF IOWA
CEDAR RAPIDS DIVISION**

UNITED STATES OF AMERICA,

        Plaintiff,

vs.

RICARDO WATKINS,

        Defendant.

No. CR 99-73-LRR

**ORDER**

_____

*TABLE OF CONTENTS*

I.      *INTRODUCTION* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *2*

II.    *PROCEDURAL BACKGROUND* . . . . . . . . . . . . . . . . . . . . . . . . . . *3*

III.   *TRIAL EVIDENCE* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *4*

IV.   *STANDARD OF REVIEW* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *13*

V.    *LEGAL ANALYSIS* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *14*

        A.    *Ineffective Assistance of Counsel* . . . . . . . . . . . . . . . . . . . . *14*

               1.    *Counsel openly argued with Defendant* . . . . . . . . . . . *17*

               2.    *Counsel referred to Defendant as "boy"* . . . . . . . . . . *17*

               3.    *Counsel told jury Defendant sold drugs* . . . . . . . . . . *17*

               4.    *Counsel failed to call witnesses* . . . . . . . . . . . . . . . . *18*

         **5.**     *Defendant deprived of opportunity to participate in*
                *defense* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **24**

         **6.**     *Counsel failed to cross-examine witnesses* . . . . . . . . . **24**

         **7.**     *Counsel misinformed Defendant about proffer letter* . . **24**

         **8.**     *Counsel failed to call Kyle Doolin to testify* . . . . . . . **29**

         **9.**     *Counsel's negative attitude* . . . . . . . . . . . . . . . . . . . **29**

         **10.**    *Counsel failed to timely file subpoenas* . . . . . . . . . . . **30**

         **11.**    *Counsel failed to object to testimony from Detective*
                *Mark Fisher* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **30**

         **12.**    *Counsel failed to object to introduction of a lab*
                *report* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **31**

   **B.**     **Trish Miller's Testimony** . . . . . . . . . . . . . . . . . . . . . . . **31**

   **C.**     **Lab Report** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **32**

   **D.**   **Sufficiency of the Evidence** . . . . . . . . . . . . . . . . . . . . . . **32**

         **1.**     *Count 1* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **32**

         **2.**     *Count 3* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **34**

   **E.**     **Prosecutorial Misconduct** . . . . . . . . . . . . . . . . . . . . . . . **34**

         **1.**     *Prosecutor's statement* . . . . . . . . . . . . . . . . . . . . . . **35**

         **2.**     *Illinois State Trooper* . . . . . . . . . . . . . . . . . . . . . . . **37**

**VI.**    **CONCLUSION** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **37**

## I. INTRODUCTION

The matters before the court are Defendant Ricardo Watkins's Pro Se Motion for New Trial (docket no. 218) and Supplemental Motion for New Trial (docket no. 220).

## II. PROCEDURAL BACKGROUND

On October 26, 1999, Defendant was charged in a five-count indictment with co-defendants Alvin Davis and Christopher Winters. Defendant was charged in Counts 1 and 3. Count 1 charged all three defendants with conspiracy to distribute and possess with intent to distribute more than 50 grams of a mixture or substance containing a detectable amount of cocaine base (commonly called "crack cocaine"), a Schedule II controlled substance, in violation of 21 U.S.C. § 846. Count 3 charged Defendant with selling, distributing or dispensing .41 grams of a mixture or substance containing a detectable amount of cocaine base (commonly called "crack cocaine"), a Schedule II controlled substance, in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(C) and 18 U.S.C. § 2.

On September 8, 9, 12 and 13, 2005, Defendant was tried before a jury. Defendant was personally present and represented by counsel, Frank Santiago. Assistant United States Attorney Daniel Tvedt represented the government. At the close of the government's case, Defendant made an oral motion for judgment of acquittal pursuant to Rule 29 of the Federal Rules of Criminal Procedure. The court denied the motion. At the conclusion of all of the evidence, Defendant orally renewed his motion for judgment of acquittal, and the court again denied the motion. On September 13, 2005, the jury found Defendant guilty of Counts 1 and 3.

On September 20, 2005, Defendant filed a Pro Se Motion for New Trial and Evidentiary Hearing ("Motion"). On September 23, 2005, Wallace Taylor filed an appearance on behalf of Defendant and also filed a Supplemental Motion for New Trial ("Supplemental Motion"). Mr. Santiago was permitted to withdraw as attorney for Defendant by order entered September 29, 2005. On September 30, 2005, the government filed a Resistance to Defendant's Motion and Supplemental Motion ("Resistance"). On November 29, 2005, December 21, 2005 and January 4, 2006, the court held hearings on

the Motion and Supplemental Motion ("Hearing"). Defendant was personally present and represented by counsel, Mr. Taylor. Assistant United States Attorney Tvedt represented the government.

After the Hearing, the court provided Defendant and the government the opportunity to submit additional briefing. On January 14, 2006, Defendant filed a Second Supplemental Brief in Support of Motion for New Trial ("Second Supplemental Brief"). On January 24, 2006, the government filed a Supplemental Resistance to Defendant's Motion for New Trial ("Supplemental Resistance").

### III. TRIAL EVIDENCE

Contrary to the assertion made by Defendant, the trial evidence included many defense witnesses who placed Defendant in a drug conspiracy and testified to a significant quantity of cocaine base distributed as part of the conspiracy.

Christopher Winters (a.k.a. "Tiny") testified that during the first six months of 1996, he sold Defendant between 63 and 126 grams of crack cocaine on six to seven separate occasions. The sales took place in Chicago, Illinois at the home of Defendant's mother or the home of Christopher Winters's mother. From 1997 until November 1999, Christopher Winters sold Defendant 63 to 126 grams of crack cocaine several times a month. In 1999, Christopher Winters once sold Defendant nine ounces of crack cocaine. Christopher Winters stated that he "figured" Defendant was selling the crack cocaine in Iowa because he knew Defendant was not selling it in Chicago. Christopher Winters saw Willie Herron, a drug supplier, with Defendant in a car in Chicago and assumed that Willie Herron was working with Defendant. During two separate drug sales between Christopher Winters and Defendant, Defendant was accompanied by Alvin Davis and an unknown "white woman." When Defendant was with Alvin Davis, Christopher Winters recalls that Defendant purchased four-and-one-half ounces of crack cocaine. Christopher

Winters testified that he had previously seen Defendant at James Meyers's house in Chicago but was not certain what the two men were doing. During the time Defendant was buying crack cocaine from Christopher Winters, Defendant claimed to own a construction company, but Christopher Winters never saw Defendant working. Christopher Winters also knew that Defendant owned a truck and had a boat which he took out on Lake Michigan. Christopher Winters pled guilty to the drug conspiracy and was serving a fifteen-year sentence at the time of trial. Christopher Winters also was facing a twenty-year sentence for attempted murder. Christopher Winters testified that he was cooperating with the government because he hoped to receive a reduced sentence.

Willie Herron (a.k.a. "Sweet Pea") testified that during the first six months of 1996, Christopher Winters was supplying Defendant with crack cocaine in Chicago to sell in Cedar Rapids, Iowa. Willie Herron, who was sixteen years of age in 1996, explained that he traveled to Chicago with Defendant approximately three times per week during the first six months in 1996 to pick up crack cocaine. Defendant paid Willie Herron $1500 for one of the trips. It appears that Willie Herron was confused by the questions asked during trial, because Willie Herron first testified the bag of crack cocaine he would sell for Defendant contained one ounce and was worth about $20,000 on the street and then later testified it was worth $2000. Although the record is unclear, the court assumes that Willie Herron was describing one-ounce bags of crack cocaine, each containing forty or fifty rocks of crack cocaine, selling for a total of $2000 and that Defendant would transport nine of these bags of crack cocaine during each trip from Chicago. Willie Herron testified he routinely carried the crack cocaine while Defendant drove the car. When they would arrive in Cedar Rapids early in the morning, Willie Herron would sell the crack cocaine for Defendant, but, by noon, Willie Herron would be sold out of crack cocaine. When Willie Herron sold all of the drugs that Defendant gave to him and gave Defendant the

proceeds from the sales, they would return to Chicago to purchase more. Willie Herron testified that, during 1996, Myron Schneider also sold crack cocaine for Defendant. During 1997 and continuing through 1999, Willie Herron made a total of three trips to Chicago with Defendant to buy the same quantity of crack cocaine that he carried in 1996 and to bring it to Cedar Rapids to sell. Willie Herron explained that, other than his dealings with Defendant, Spooky (a.k.a. "James Meyers") and Jessica Martley also made trips from Chicago to transport crack cocaine for Defendant and Gretchen Brown, Terriana, A.D. (a.k.a. "Alvin Davis") and Spooky (a.k.a. "James Meyers") sold crack cocaine for Defendant. Willie Herron continued to sell crack cocaine for Defendant until 1999. Willie Herron testified that he had pled guilty to drug charges and was hoping to get his sentence reduced for helping the government in its prosecution of others.

Robert Watkins, Jr., Defendant's brother, testified that Defendant obtained crack cocaine in Chicago from Christopher Winters, Eric Thurmon ( a.k.a. "IROC"), "XL" and "Paris." Robert Watkins, Jr. stated that Defendant was selling approximately four ounces of crack cocaine in Cedar Rapids per week during the first six months of 1996. Robert Watkins, Jr. witnessed Defendant purchase crack cocaine from Christopher Winters a few times around March or April of 1996. On one occasion, Defendant and Robert Watkins, Jr. were in the bathroom of their mother's home along with Christopher Winters. While in the bathroom, Defendant purchased four-and-one-half ounces of crack cocaine from Christopher Winters for approximately $3500. Defendant explained to Robert Watkins, Jr. and Christopher Winters that he was going to sell the drugs in Cedar Rapids. In the spring of 1996, Robert Watkins, Jr. also saw Defendant purchase four-and-one-half ounces of crack cocaine from Christopher Winters for $2750. Defendant again explained to Robert Watkins, Jr. that he was planning to sell the drugs in Cedar Rapids. Robert Watkins, Jr. testified that he saw Defendant purchase four-and-one-half ounces from "XL"

for about $3250. Robert Watkins, Jr. stated that, during the time Defendant was selling crack cocaine, Defendant was not employed. Robert Watkins, Jr. stated that Willie Herron, Dwayne Shears ( a.k.a. "Quaker") and a few additional men from the Chicago area were selling crack cocaine in Cedar Rapids for Defendant. Prior to Defendant's trial, Robert Watkins, Jr. pled guilty to possession of crack cocaine with the intent to distribute. His original sentence was two hundred and sixty-two months and had already been reduced to sixty-six months for cooperating with the government.

Dewayne Shears testified that, during the first half of 1996, he made three trips from Cedar Rapids to Chicago with Defendant. While in Chicago, Defendant would give him one to one-and-one-half ounces of crack cocaine. Defendant would purchase a bus ticket for Dewayne Shears from Chicago to Cedar Rapids, and Dewayne Shears would carry the crack cocaine with him on the bus. Upon arriving in Cedar Rapids, Dewayne Shears would meet either Defendant or Alvin Davis at the Red Roof Inn. Dewayne Shears explained that the crack cocaine from Chicago would be cut up with razor blades and put into sandwich baggies in Cedar Rapids. Defendant paid Dewayne Shears $250 for carrying the crack cocaine from Chicago to Cedar Rapids. During one trip from Chicago in which Dewayne Shears was carrying crack cocaine for Defendant, Defendant, Craig Sanders and Dewayne Shears were stopped by the police. Dewayne Shears explained that the crack cocaine was never found because he hid it between his "buttock cheeks." Dewayne Shears testified that he made trips to Chicago for Defendant only three times, but he knew that Defendant was bringing crack cocaine into Cedar Rapids at least once or twice per week. During the first half of 1996, Dewayne Shears stated that he was selling crack cocaine on behalf of Defendant every day for about three months. In addition to himself, Dewayne Shears knew Sparks, A.D. (a.k.a. "Alvin Davis"), Sweet Pea (a.k.a. "Willie Herron") and Isaac White were obtaining crack cocaine from Defendant to sell.

Dewayne Shears testified under a cooperation agreement and hoped to obtain a further decrease in his sentence for cooperating.

Wallace Maxwell (a.k.a. "Chip") testified that he sold crack cocaine for Robert Watkins, Jr. in Cedar Rapids before Robert Watkins, Jr.'s arrest. He met Alvin Davis in Cedar Rapids some time after September 1997, and Alvin Davis told Wallace Maxwell about Defendant. Alvin Davis said Robert Watkins, Jr.'s brother, Defendant, was in Cedar Rapids, and Alvin Davis explained that he and Defendant could take over the town, "do their thing," "get money" and leave.

Alvin Davis (a.k.a. "A.D.") testified that he sold crack cocaine for Defendant in 1996, but he only sold for Defendant on a more permanent basis in 1997. In early 1996, Defendant and Dewayne Shears went to Alvin Davis's house in Chicago with approximately two ounces of crack cocaine. While at Alvin Davis's house, Defendant and Dewayne Shears cut up the crack cocaine and packaged it. Alvin Davis's role in the "crack business" with Defendant was to establish the clientele and find the houses in Cedar Rapids that he and Defendant would use to sell the crack cocaine, because Alvin Davis was always in the streets and knew people who would want to buy crack cocaine. Alvin Davis explained that Defendant's role in the arrangement was to obtain larger quantities of crack cocaine in Chicago and transport it or have it transported back to Cedar Rapids. Defendant would frequently hire others to transport the crack cocaine between the two cities. Dewayne Shears, Eugene Johnson, Jessica Martley, Erica (l.n.u.), and Christian Phillips all carried crack cocaine for Defendant. Defendant would provide most of these couriers with a bus ticket from Chicago to Cedar Rapids. Defendant would hide the crack cocaine in an old Corvette in his yard in Chicago until a courier arrived to transport it to Cedar Rapids. Alvin Davis explained that, if he brought crack cocaine in from Chicago, he would take a female with him and she would carry it.

When the crack cocaine arrived in Cedar Rapids, the couriers would bring it to Alvin Davis. If Defendant had not arrived, Alvin Davis would hide the crack cocaine in the park. Defendant and Alvin Davis would meet at the Red Roof Inn during 1996 and 1997 or at apartments rented by Trish Miller, Sherry Thompson or Heather Johnson during 1999. The two men would evenly divide the crack cocaine and sell their own portions. In 1997, Alvin Davis and Defendant were bringing four-and-one-half ounces of crack cocaine into Cedar Rapids once or twice a week. In October and November 1997, sales increased, so Alvin Davis and Defendant began to bring in a larger quantity of crack cocaine until 1998 when they ceased doing business together. In 1999, however, Alvin Davis started dealing crack cocaine with Defendant again. Alvin Davis testified that he saw Defendant personally sell crack cocaine to "crack heads" and to Evangeline Hopkins, Defendant's girlfriend. Alvin Davis testified that, in March 1998, he and Defendant sold crack cocaine to Evangeline Hopkins who was working as a confidential informant for the Cedar Rapids Police Department. Alvin Davis stated that he and Defendant each sold Evangeline Hopkins a $50 rock of crack cocaine. During trial, Alvin Davis identified the crack cocaine introduced by the government as being consistent with the way he and Defendant packaged crack cocaine. Alvin Davis testified pursuant to a cooperation agreement that he entered into with the government.

Evangeline Hopkins was working as a confidential informant for the Cedar Rapids Police Department in 1998. In March 1998, Police Officer Melissa Henderson monitored Evangeline Hopkins as she made a controlled buy from Alvin Davis and Defendant. Evangeline Hopkins purchased crack cocaine from them at an apartment with the same address as Trish Miller's apartment.

Officer Melissa Henderson testified that on March 19, 1998, a controlled buy transaction was set up with Alvin Davis and Defendant. This was one of three controlled

buys made by Evangeline Hopkins on March 18 and 19, 1998. Officers searched Evangeline Hopkins before the transaction and their results were negative. Evangeline Hopkins was driven by Officer Melissa Henderson to 1102 Westwood Drive, where Evangeline Hopkins made contact with Alvin Davis by phone. Officer Melissa Henderson observed two individuals arrive and enter the residence just before the sale. Evangeline Hopkins went in and purchased crack cocaine for $100 from Defendant and Davis. Evangeline Hopkins turned over the crack cocaine to Officer Melissa Henderson. Officers again searched Evangeline Hopkins, and they found nothing.

Eric Lawrence testified that he saw Defendant give bags of crack cocaine to Dewayne Shears two or three times per day for three to four days per month during 1996. Each bag contained approximately twenty, $20 rocks of crack cocaine, and Dewayne Shears would either sell or smoke the contents of each bag. Eric Lawrence used crack cocaine with Dewayne Shears. Others that Eric Lawrence witnessed working with Defendant included Sparks, Jessica Martley and Willie Herron.

Jessica Martley testified that she met Defendant in 1996 when she saw him with $20 and $50 bags of crack cocaine. Jessica Martley knew that Defendant was going to Chicago every few days to obtain crack cocaine. Jessica Martley stated that, in the fall of 1997, she drove Defendant to Chicago where Defendant purchased crack cocaine and marijuana to bring back to Cedar Rapids. She drove Defendant to Chicago to pick up drugs seven or eight times and each time they would stay in Chicago at the home of Defendant's mother. Jessica Martley saw Defendant get crack cocaine from James Meyers ( a.k.a. "Spooky"). Jessica Martley saw Defendant with Christopher Winters in Chicago. Defendant packaged the crack cocaine in Chicago for transport to Cedar Rapids. Jessica Martley saw Defendant and James Meyers weigh out two to three ounces of crack cocaine. Jessica Martley explained that she and Defendant carried the crack cocaine and marijuana

in their laps so that they could quickly throw it out of the window if they were stopped by the police. One time Defendant asked Jessica Martley to carry crack cocaine in her vagina and ride the bus from Chicago to Cedar Rapids. Jessica Martley agreed to carry the crack cocaine but she actually carried it in her shirt and pants. Sparks, Christopher Winters's father, accompanied her on the trip. When she got off of the bus in Cedar Rapids, she gave the crack cocaine to Defendant. Defendant paid Jessica Martley $100 for assisting him. Jessica Martley saw Alvin Davis, Willie Herron, Maurice Davis and Dewayne Shears working for Defendant. At times, Willie Herron gave Jessica Martley money that he had earned selling drugs and told her to give it to Defendant.

Trish Miller testified that she met Defendant at the end of 1997 and that she purchased crack cocaine from him at least one time per day over a six to eight week period. The largest quantity that Trish Miller ever purchased from Defendant was one-half ounce for $500 and the total amount that Trish Miller purchased from Defendant was about three to six ounces. After purchasing the crack cocaine, Trish Miller would deliver it to Heather Johnson and others who had previously given her money for the drugs. Trish Miller testified that she knew Defendant was purchasing the crack cocaine in Chicago and, on three or four occasions, would then use Trish Miller's apartment to break down and package the crack cocaine. Once, Trish Miller witnessed Defendant weighing out three ounces of crack cocaine. Another time, Trish Miller saw Yolanda Files deliver two ounces of crack cocaine to Defendant. Trish Miller explained that Yolanda Files utilized her vagina and condoms to transport the crack cocaine for Defendant from Chicago. Trish Miller witnessed Alvin Davis, "Main" and "C" help package the crack cocaine. Trish Miller stated that men named Toby and Ryan Roquette also transported crack cocaine from Chicago to Cedar Rapids for Defendant. During the time that Trish Miller knew Defendant, Alvin Davis and Darryl Jackson were also involved with Defendant in the sale

of crack cocaine. Sylvester, Defendant's family member, also delivered marijuana and crack cocaine to Defendant at Trish Miller's apartment.

Gretchen Brown, a Cedar Rapids resident, saw seventeen or eighteen year old teenagers from Chicago selling crack cocaine in people's homes and on the streets in Cedar Rapids. Defendant once told her that Quaker (a.k.a. "Dewayne Shears") ripped him off by smoking more crack cocaine than he sold. She saw Defendant with Sweet Pea (a.k.a. "Willie Herron"), Quaker (a.k.a. "Dewayne Shears") and Rob Lewis. She saw Defendant receive money from the street kids. She was concerned about the kids from Chicago because they were away from home and they did not have clothes or other things they needed.

Detective Mark Fisher, a former Cedar Rapids Police Officer, testified that, in July 1998, Defendant contacted him and requested to talk. Thereafter, Detective Mark Fisher met with Defendant at a rest area located on I-380, south of Cedar Rapids. Defendant asked Detective Mark Fisher if he was under investigation. Detective Mark Fisher told Defendant that he was under investigation for drug dealing. While discussing Defendant's drug dealing, Defendant explained that he kept coming to Cedar Rapids with drugs because there was so much money to be made in Cedar Rapids. Defendant stated that he could assist law enforcement officers by giving them the names of large crack cocaine dealers in Chicago. Sometime thereafter, Defendant left Cedar Rapids. In October 1999, an Indictment was returned against Defendant in the Northern District of Iowa and a warrant issued for his arrest. The United States Marshal's Service was unable to locate Defendant to arrest him.

After the Indictment against Defendant was returned, Detective Mark Fisher advised Robert Watkins, Jr. that Defendant had been charged. Detective Mark Fisher asked Robert Watkins, Jr. to relay that information to Defendant and urge Defendant to turn

himself in to authorities.  Sometime after January 1997 and when Robert Watkins, Jr. was in prison, Robert Watkins, Jr. called his mother's house to speak with her.  It just so happened that Defendant was there so he talked to Defendant as well as his mother.  During that conversation, Robert Watkins, Jr. told Defendant that there was a warrant out for him and he should turn himself in to authorities.  Robert Watkins, Jr. also saw Defendant in Phoenix about one year before the trial and briefly talked to him.  At that time, Defendant mentioned that he was thinking about dealing in marijuana.

Defendant was arrested on March 15, 2005 as a result of a traffic stop in Illinois.  Defendant was the driver of the car and three others were riding in the car.  When he was stopped by Illinois State Trooper Chad Broyles, Defendant gave a false name and produced a driver's license in the name of Marcel Roquette.  Defendant's picture appeared on the license.  Defendant indicated that he had traveled from Iowa and was on his way to Chicago.  Defendant told the Trooper that he was a tow truck driver for JB Towing in Indiana but he did not know the name of the town in which the company was located or how long he had worked there.  After a finger print comparison, Trooper Chad Broyles figured out that Defendant's name was Ricardo Watkins and that a warrant for his arrest had been issued in the Northern District of Iowa.  Defendant acknowledged that he was wanted in Iowa.  Pursuant to a search of Defendant's vehicle, law enforcement found several pounds of marijuana and over two thousand dollars in cash on Defendant's person.  Defendant told Trooper Chad Broyles that he had been stopped several other times, that sometimes he had marijuana in the car and that law enforcement had never figured out who he was.

## IV.  STANDARD OF REVIEW

Federal Rule of Criminal Procedure 33 provides that "[u]pon the defendant's motion, the court may vacate any judgment and grant a new trial if the interest of justice

so requires." Fed. R. Crim. P. 33. Under Rule 33, district courts are granted broad discretion in considering motions for a new trial. *United States v. Wilkins*, 139 F.3d 603, 604 (8th Cir. 1998). A district court may "weigh the evidence, disbelieve witnesses, and grant a new trial even where there is substantial evidence to sustain the verdict." *United States v. Campos*, 306 F.3d 577, 579 (8th Cir. 2002) (quoting *White v. Pence*, 961 F.2d 776, 780 (8th Cir. 1992)). However, unless the district court "ultimately determines that a miscarriage of justice will occur, the jury's verdict must be allowed to stand." *Id.* (citing *United States v. Lacey*, 219 F.3d 779, 783 (8th Cir. 2000)); *see also Ortega v. United States*, 270 F.3d 540, 547 (8th Cir. 2001) (noting a district court may grant a new trial under Rule 33 "only if the evidence weighs heavily enough against the verdict that a miscarriage of justice may have occurred").

The Eighth Circuit Court of Appeals has noted that district courts enjoy more latitude in granting new trials under Rule 33 than in granting motions for acquittal under Rule 29. *Campos*, 306 F.3d at 579. However, "[m]otions for new trials based on the weight of the evidence are generally disfavored," and, therefore, district courts should exercise their Rule 33 authority "sparingly and with caution." *Id.*; *see also United States v. Lincoln*, 630 F.2d 1313, 1319 (8th Cir. 1980).

## V. LEGAL ANALYSIS

### A. Ineffective Assistance of Counsel

In support of his Motion and Supplemental Motion, Defendant asserts that he received ineffective assistance of counsel. Specifically, Defendant alleges that Mr. Santiago (1) openly argued with Defendant in front of the jurors; (2) demeaned Defendant by referring to him as "boy"; (3) told the jury that Defendant had sold drugs; (4) refused to call witnesses requested by Defendant; (5) denied Defendant an opportunity to participate in his own defense; (6) refused to heed Defendant's desire to cross-examine the

government's witnesses; (7) misled Defendant as to the admissibility of statements made by Defendant during plea negotiations with the government; (8) failed to call Kyle Doolin, a vital defense witness; (9) was negative about the potential outcome of Defendant's trial; (10) failed to timely file subpoenas for trial witnesses; (11) should have objected to Defendant being questioned by Detective Mark Fisher, who was not a law enforcement officer; and (12) failed to object to the introduction of a lab report. Defendant alleges that counsel's misconduct prejudiced his trial.

The Sixth Amendment right to effective counsel is clearly established. *See Strickland v. Washington*, 466 U.S. 668 (1984). In *Strickland*, the United States Supreme Court explained that a violation of that right has two components:

> *First*, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. *Second*, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.

*Id.* at 687 (emphasis added); *see also Williams v. Taylor*, 529 U.S. 362, 390 (2000) (reaffirming *Strickland* standard). Thus, *Strickland* requires a showing of both deficient performance and prejudice. *Id.* However, a court deciding an ineffective assistance claim need not address both components of the inquiry if the defendant makes an insufficient showing on one. *Strickland*, 466 U.S. at 697. "If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, . . . that course should be followed." *Id.*; *see also United States. v. Apfel*, 97 F.3d 1074, 1076 (8th Cir. 1996) ("[A court] need not address the reasonableness of the attorney's behavior if the movant cannot prove prejudice.").

To establish unreasonably deficient performance, a "defendant must show that counsel's representation fell below an objective standard of reasonableness." *Strickland*, 466 U.S. at 688. The "reasonableness of counsel's challenged conduct [must be reviewed] on the facts of the particular case, viewed as of the time of counsel's conduct." *Id.* at 690. There is a strong presumption of competence and reasonable professional judgment. *Id.*; *see also United States v. Taylor*, 258 F.3d 815, 818 (8th Cir. 2001) (operating on the "strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance") (quoting *Strickland*, 466 U.S. at 689); *Sanders v. Trickey*, 875 F.2d 205, 210 (8th Cir. 1989) (affording counsel broad latitude to make strategic and tactical choices regarding the appropriate action to take or refrain from taking) (citing *Strickland*, 466 U.S. at 694). In sum, the court must "determine whether, in light of all the circumstances, the identified acts or omissions were outside the wide range of professionally competent assistance." *Strickland*, 466 U.S. at 690.

To establish prejudice, "[i]t is not enough for the defendant to show that the errors had some conceivable effect on the outcome of the proceeding." *Id.* at 693. Rather, a defendant "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. *Id.* at 694. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* In other words, "the question is whether there is a reasonable probability that, absent the errors, the fact finder would have had a reasonable doubt respecting guilt." *Id.* at 695. In answering that question, the court "must consider the totality of the evidence before the judge or jury." *Id.*

Having laid out the appropriate standard, the court now addresses those grounds which Defendant alleges constitute ineffective assistance of counsel.

### 1. Counsel openly argued with Defendant

Defendant asserts that Mr. Santiago "openly argued with [him] in front of the jurors." The undersigned was able to personally observe both Defendant and Mr. Santiago throughout the trial and never saw Defendant arguing with Mr. Santiago. As the government noted in its Resistance, Mr. Santiago and Defendant communicated during trial, however, there was no indication that they were "openly argu[ing]" in front of the jury. In any event, Defendant has failed to establish that Mr. Santiago's conduct was deficient or that his case was prejudiced by any alleged interaction between himself and Mr. Santiago. Accordingly, the court finds that this assertion of ineffective assistance of counsel is without merit.

### 2. Counsel referred to Defendant as "boy"

Defendant alleges that Mr. Santiago referred to him as "boy" in front of the jury. Defendant asserts that "a non-black man calling a black man 'boy' is very demeaning and racist and served to diminish [Defendant's] standing before the jury." During the Hearing, Mr. Santiago testified that he referred to Defendant as boy during closing arguments "to attempt to reach the hearts of the jurors." Mr. Santiago explained that he did not intend for the reference to be demeaning to Defendant or derogatory in nature. Defendant has failed to show that Mr. Santiago's decision to remind jurors that Defendant was not just a criminal defendant but a young person or "boy" was improper in the context it was used or that it prejudiced his defense. The court finds that this assertion of ineffective assistance of counsel is meritless.

### 3. Counsel told the jury that Defendant sold drugs

Defendant contends that Mr. Santiago improperly told the jury that Defendant had sold drugs and that his comment prejudiced the jury. During the Hearing, the government

asked Mr. Santiago if he told the jury that Defendant sold drugs. Mr. Santiago vehemently denied making such a statement and testified that, if he had, surely the government would have seized the opportunity to "exploit" the statement. The court does not recall that any such statement was made to the jury.[1] Accordingly, Defendant's assertion is meritless.

### 4. Counsel failed to call witnesses

Defendant asserts that he received ineffective assistance of counsel because Mr. Santiago refused to call the witnesses that he had requested. Defendant alleges that Mr. Santiago should have called the following witnesses to testify: Doris Dixon, Jerrette Dixon, Jacardo Dixon, Moet Dixon, Odessa Watkins, Robert Watkins, Sr., Yolanda Files, Alicia Jackson, Octavia Jackson, Linda Moore, Marvin Lumpkins, James Meyers, Betty Rundle, Betty Taylor, Denise Roquette, Debra Jackson, Danya Roquette, Harriet Cooper, Ronney Glover, Eugene Johnson, Craig Sanders, Erica (l.n.u.), Donjeola Barker and an unknown witness.

Defendant asserts that Mr. Santiago improperly failed to call Yolanda Files, Doris Dixon, Jerrette Dixon, Jacardo Dixon and Moet Dixon, who would have rebutted the testimony of Robert Watkins, Jr. Robert Watkins, Jr. testified for the government at trial. During cross examination, Mr. Santiago questioned Robert Watkins, Jr.'s motivation for testifying against his brother. It was clearly established that Robert Watkins, Jr.'s primary motivation for testifying against his brother was a cooperation agreement that he entered into with the government. Mr. Santiago tried unsuccessfully to get Robert Watkins, Jr. to state that he and Defendant had a fight and that the fight was a motivating factor for testifying against his brother. The court assumes that testimony from the above identified witnesses would have been utilized to impeach Robert Watkins, Jr., who testified on cross-

---

[1] The court notes that Defendant did not request a copy of the trial transcript prior to filing his Motion and Supplemental Motion.

examination that he did not recall a fight between himself and Defendant. At the Hearing, Mr. Santiago testified that he did not subpoena any of these witnesses to testify and that Defendant did not request that they testify on his behalf. There is no evidence the witnesses would have testified consistent with Defendant's representation. Further, there is no evidence that the case would have resulted in an acquittal had these witnesses testified. The jury already knew that Robert Watkins, Jr. had made a "deal" with the government to obtain a favorable disposition of his case, and it is unlikely that informing the jury that Defendant and his brother once had a fight would have been more compelling impeachment than the jury had already heard.

Defendant also contends that Mr. Santiago improperly failed to call Robert Watkins, Sr., Defendant's father, to testify and that Robert Watkins, Sr. would have testified that "no drugs [were] being sold in his house." At the Hearing, Mr. Santiago testified that he did not subpoena Robert Watkins, Sr. to testify and Defendant did not request that he testify. Defendant alleges that Mr. Santiago should have called Odessa Watkins, Defendant's mother, to testify that Defendant did not sell controlled substances in her home. During the Hearing, Odessa Watkins testified that she was "pretty sure" that she would have seen drug activity going on in her house if it had occurred. She also explained that Defendant was self-employed as a contractor. During the Hearing, Mr. Santiago testified that, after discussing Odessa Watkins's potential testimony, "it was agreed upon by both [Defendant] and [Mr. Santiago]" not to call Odessa Watkins to testify during trial. Further, assuming for the sake of argument that Defendant's father and mother would have been called to testify, there is no evidence that the outcome of the case would have been different. Defendant's parents are not unbiased witnesses and obviously would not have been aware of the activities at their home at all times of the day and night. At the Hearing, Defendant's mother testified that in 1996 she worked a full-time job, she did not know if

Defendant had a key to her house and Defendant actually lived with his grandmother. Further, a considerable amount of the illegal activity took place in Cedar Rapids as opposed to Chicago. Whether or not Defendant did construction work in Chicago was of limited relevance. Legal employment and drug dealing are not mutually exclusive. From the Hearing it was clear the government would have been able to elicit useful information from Odessa Watkins which would have tied Alvin Davis and Christopher Winters to Defendant and would have put the three of them at her house during a relevant time period.

Defendant asserts that Mr. Santiago should have called Alicia Jackson, Octavia Jackson, Linda Moore, Marvin Lumpkins, Betty Rundle, Betty Taylor, Harriet Cooper, Eugene Johnson, Craig Sanders and Donjeola Barker. At the Hearing, Mr. Santiago testified that he had never heard of any of these people. According to Defendant, Alicia Jackson, Octavia Jackson, Linda Moore, Marvin Lumpkins, Betty Rundle, Betty Taylor and Harriet Cooper would have been able to testify about manual labor Defendant had engaged in in the Chicago area. Further, assuming for the sake of argument that these witnesses would have been called to testify and would have testified as Defendant represents, there is no evidence that the outcome of the case would have been different. Even if Defendant engaged in construction work during the times at issue, he would still have had time to engage in a drug conspiracy.

Defendant contends that Mr. Santiago improperly failed to call Denise Roquette, Debra Jackson and Danya Roquette. Defendant claims Denise Roquette would have testified that he lived with her on O Avenue in Cedar Rapids. Debra Jackson allegedly would have testified that Trish Miller was forced to testify for the prosecution. Danya Roquette would have testified that she never carried drugs for Defendant. At the Hearing, Mr. Santiago testified that, after interviewing Denise Roquette and Danya Roquette,

witnesses mentioned by Defendant in his Motion, Mr. Santiago could not "in good conscious" put either person on the stand to testify. Mr. Santiago stated that Defendant did not request to have Debra Jackson testify on his behalf until the Friday before trial. This was not enough time for Mr. Santiago to request a subpoena for her testimony. There is no evidence that the outcome of the trial would have been different had these witnesses testified. Apparently, Defendant thought that, if he could establish that the government forced Trish Miller to testify, it would benefit his defense. Assuming that such testimony would be admissible and that Trish Miller would testify as asserted by Defendant, it is difficult to see how that would have influenced the outcome of the case. During her testimony, Trish Miller admitted that she told Debra Jackson, a person who had been housed on her cell block, that she did not want to have anything to do with the case or testify during the trial. Trish Miller explained that she made those statements because she feared for her safety if others in the cell block knew she was testifying for the government.

On March 15, 2005, Illinois State Trooper Chad Broyles executed a traffic stop on a vehicle driven by Defendant. A substantial sum of money was found on Defendant and marijuana was found in the vehicle. Although marijuana was found in the vehicle, Defendant was never charged with possession of marijuana. As a result of the stop, Defendant was arrested on a warrant issued in October 1999 for the instant case. On the issue of Defendant's flight to avoid prosecution, the evidence was admitted under Federal Rule of Evidence 404(b). The evidence of marijuana in the car also partially corroborated the testimony of Robert Watkins, Jr. and other witnesses who testified that Defendant also engaged in marijuana trafficking. In his Motion, Defendant claims that several witnesses should have been called to rebut the testimony of Trooper Chad Broyles.

Defendant alleges that Mr. Santiago was ineffective for failing to call Ronney Glover. Defendant asserts that Ronney Glover would have testified that neither he nor

Defendant was aware that the car contained marijuana.  During the Hearing, Mr. Santiago explained that neither he nor Defendant knew the whereabouts of Ronney Glover, so Mr. Santiago was unable to either interview him or issue a subpoena compelling his testimony. According to Defendant, Eugene Johnson would have testified that the vehicle was registered in his girlfriend's name, that he was giving Defendant a ride to Chicago and that neither he nor Defendant knew there was marijuana in the vehicle.  Defendant claims Mr. Santiago was negligent in failing to call Craig Sanders and Donjeola Barker who were also apparently present during the traffic stop in Illinois and who would have testified that there were no drugs in the vehicle.  At the Hearing, Mr. Santiago testified that he had never heard of Eugene Johnson, Craig Sanders or Donjeola Barker.  Mr. Taylor subpoenaed Craig Sanders to the Hearing to provide an offer of proof.  Attorney Mark Meyer met with Craig Sanders before the Hearing.  After talking with his attorney, Sanders indicated that he would assert his Fifth Amendment privilege against self-incrimination if called to testify.

Defendant also asserts that Mr. Santiago neglected to call James Meyers, a federal inmate.  Defendant claims that James Meyers would have testified that Defendant has never met or seen Jessica Martley.  There is no evidence that James Meyers would have testified as represented by Defendant. At the Hearing, Mr. Santiago testified that he subpoenaed James Meyers to testify but, after discussing Defendant's case with James Meyers, determined that it would not be in Defendant's best interest to put James Meyers on the stand.  Mr. Santiago stated that, during trial, he explained to Defendant his reasons for not wanting to call James Meyers to testify.  Apparently, James Meyers was a reluctant witness because of concerns about his own situation.  At the Hearing, Mr. Taylor subpoenaed James Meyers to provide an offer of proof.  James Meyers's counsel, Al Willett,  explained that he had advised James Meyers to assert his Fifth Amendment right

against self-incrimination if called to testify. Mr. Willett also relayed that James Meyers would have asserted his Fifth Amendment right not to testify had he been called to testify at trial.

Defendant asserts that Mr. Santiago should have called a woman named Erica, and she would have testified that she never transported controlled substances for Defendant. In his Motion, however, Defendant admits that he does not know Erica's last name, and, at the Hearing, Mr. Santiago testified that Defendant never requested that he locate this witness.

Defendant finally alleges that Mr. Santiago should have called "another person - name unknown" to testify that the marijuana in the vehicle stopped in Illinois did not belong to Defendant. In his Motion, Defendant again admits that he does not know the name of the potential witness. Mr. Santiago cannot be ineffective for failing to call an "unknown" witness.

Mr. Taylor called Daryl Jackson to proffer at the Hearing. Darryl Jackson requested an opportunity to talk with his attorney, Eric Parrish, prior to being asked to testify. Mr. Parrish met with his client and advised Darryl Jackson to invoke his Fifth Amendment right.

Defendant has failed to show that Mr. Santiago's failure to call these witnesses resulted in deficient representation and has not shown that, if these witnesses had been called to testify, the outcome of his trial would have been any different. *See Strickland*, 466 U.S. 687. Defendant did not inform Mr. Santiago of these witnesses before trial or in sufficient time to secure their appearance at trial, agreed with Mr. Santiago that their testimony should not be presented to the jury and failed to show that their testimony would have benefitted his defense. Accordingly, this court finds that Mr. Santiago did not

provide ineffective assistance of counsel when he failed to call the witnesses listed in Defendant's Motion and Supplemental Motion.

### 5. *Defendant deprived of opportunity to participate in defense*

Defendant contends that he received ineffective assistance of counsel because Mr. Santiago denied him the opportunity to participate in planning his defense. Defendant also contends that Mr. Santiago refused to heed his desires as to the cross examination of prosecution witnesses. Mr. Santiago testified at the Hearing that Defendant actively assisted him during the trial by helping him focus his cross-examination of the government witnesses. Accordingly, Defendant has not met either prong of *Strickland*, and the court denies Defendant's request for a new trial on this ground.

### 6. *Counsel failed to cross-examine witnesses*

Defense counsel alleges that Mr. Santiago was ineffective because he failed to thoroughly cross-examine Alvin Davis, Robert Watkins, Jr. and Willie Herron. Certainly, prior statements by a witness can be a fertile ground for impeachment, but where there is other evidence corroborating the trial testimony of a witness, it is very difficult to show the trial outcome would have been different had specific questions been asked on cross examination. Such is the case before the court. Further, (1) the jury could have chosen not to believe the witnesses and (2) Mr. Santiago did cross examine these witnesses on other issues.

### 7. *Counsel misinformed Defendant about proffer letter*

Defendant asserts that he received ineffective assistance of counsel because Mr. Santiago incorrectly informed him that his statements to law enforcement pursuant to a proffer letter could only be used against him if he took the stand. The argument is that the proffer letter prevented him from calling witnesses. Mr. Taylor agreed with the court at

the Hearing that Mr. Santiago incorrectly advised Defendant concerning the contents of the 2005 proffer letter. The 2005 Iowa proffer letter contains the following provision:

> All information provided by your client, including incriminating statements, **may** be used in the following circumstances:
>
> * * *
>
> g.    derivatively or indirectly, including but not limited to the following: to impeach your client's credibility and to focus questioning during cross-examination; for use in a rebuttal case against your client; to develop leads from the information provided; and for all other non-evidentiary purposes.

(Emphasis in original.) During the Hearing, Mr. Santiago testified that the phrase "for use in a rebuttal case against your client" is ambiguous. Mr. Santiago explained that he understood the phrase to mean that, if Defendant testified at his trial contrary to his statement to the government, the statement made pursuant to the proffer letter could be used against him. "Rebuttal evidence," however, is defined as "that which tends to explain or contradict or disprove evidence offered by the adverse party" and "evidence which is offered by a party after he has rested his case and after the opponent has rested in order to contradict the opponent's evidence." Black's Law Dictionary 1139 (5th ed. 1979). Defendant's statements could clearly be used "for all other non-evidentiary purposes." The court concludes that by informing Defendant that his statements could only be used if he took the stand, Mr. Santiago's representation fell below the standard of reasonable professional competence guaranteed by the Sixth Amendment.

Defendant, however, has not shown that, but for Mr. Santiago's advice, the result of his trial would have been different. *See United States v. Regenos*, 405 F.3d 691, 693 (8th Cir. 2005). Defendant asserts that, because Mr. Santiago's advice regarding the proffer letter was incorrect, he did not sign the proffer letter voluntarily and, therefore,

his case was prejudiced. "[A]bsent some affirmative indication that the agreement was entered into unknowingly or involuntarily, an agreement to waive the exclusionary provisions of the plea-statement Rules is valid and enforceable." *United States v. Mezzanatto*, 513 U.S. 196, 210 (1995); *United States v. Young*, 223 F.3d 905, 909-10 (8th Cir. 2000). Because Defendant relied on the advice given to him by Mr. Santiago, he did not sign the proffer letter *knowing* that his statements could be used, even if he did not testify. Defendant did not understand that the government could use his statements if he presented any contrary evidence. Accordingly, because of Mr. Santiago's incorrect advice, Defendant did not knowingly sign the 2005 Iowa proffer letter. This, however, does not fulfill Defendant's burden of proving the second prong of *Strickland*.

Defendant must still prove that, even if Mr. Santiago's assistance was deficient and caused him to unknowingly sign a proffer letter, the outcome of his trial would have been different. *Strickland*, 466 U.S. at 694-695. In subsection 4 above, the court addressed Mr. Santiago's failure to call the specific witnesses now requested by Defendant. As noted, Defendant did not inform Mr. Santiago of these witnesses before trial or in sufficient time to secure their appearance at trial, agreed with Mr. Santiago that their testimony should not be presented to the jury or failed to show that their testimony would have benefitted his defense.

Mr. Santiago had Kyle Doolin brought from the jail to testify at trial but he made the decision not to call him as a witness, apparently due, in part, to the court's finding that the proffer statements of Defendant might be admissible were the defense to put on a rebuttal case in which witnesses testified contrary to Defendant's proffer. During the trial, at the urging of the court, Mr. Santiago made an offer of proof regarding Kyle Doolin. Out of the presence of the jury, Kyle Doolin testified that, while he was in the Linn County Jail, Robert Lewis, Wallace Maxwell, Eric Lawrence and Alvin Davis contacted him on

separate occasions about fabricating stories and providing them to Assistant United States Attorney Patrick Reinert. They explained that he could then get a reduction in his sentence for assisting the government. On cross-examination, Kyle Doolin admitted that, although he had numerous opportunities to do so, he did not tell law enforcement or the court about these men and this information. Although this information, if accepted as true, would have provided the jurors with information regarding government witnesses, Defendant has not proven the outcome of his case would have been different. Kyle Doolin had no evidence to offer that Robert Lewis, Wallace Maxwell, Eric Lawrence and Alvin Davis intended to testify falsely at Defendant's trial or in fact testified falsely at trial. The testimony of Robert Lewis, Wallace Maxwell, Eric Lawrence and Alvin Davis was corroborated by other evidence. Even without the testimony of the witnesses that Kyle Doolin claims urged him to fabricate stories, the other evidence presented by the government proved that Defendant committed the charged offenses.

Furthermore, Defendant signed a separate proffer letter in Illinois on August 3, 1998[2], which provided in pertinent part the following:

> The government is completely free to pursue any and all investigative leads derived in any way from the proffer, which would result in the acquisition of evidence admissible against you. Furthermore, if you should subsequently testify contrary to the substance of the proffer, or otherwise present a position inconsistent with the proffer, nothing shall prevent the government from using the substance of the proffer at

---

[2]At the Hearing, Mr. Taylor objected to the admission of Exhibits 3 and 4 on the grounds of hearsay, relevance and lack of foundation. The objections are overruled. The exhibits are highly relevant to the Motion and Supplemental Motion before the court. They were discussed during Defendant's trial and there was never any suggestion that Defendant did not sign the proffer agreement or give the interview.

> sentencing for any purpose, at trial for impeachment or in
> rebuttal testimony, or in a prosecution for perjury.

Defendant was not represented by Mr. Santiago in 1998 and there is no evidence that he signed the proffer letter unknowingly or involuntarily. Mr. Taylor asserts that, because Defendant was not represented by counsel when he signed the 1998 proffer letter, he could not have done so knowingly. As the letter specifically notes, however, Defendant was not under arrest or otherwise in custody at the time the letter was signed and, in fact, requested the meeting with law enforcement during which the letter was signed. It is clear, even to a lay person, that, if Defendant ever "testified contrary to" or "presented a position inconsistent with" the information provided to the government, the government could use any statement during trial. Although Defendant was not represented by counsel, he should have clearly understood that, if he lied to the government, his previous statement could be used against him. There is no evidence that Defendant entered into the 1998 agreement unknowingly or involuntarily and, therefore, he is bound by the waiver. The statement made by Defendant pursuant to the 1998 Illinois proffer letter would have had the same effect as the statement made by Defendant pursuant to the 2005 Iowa proffer letter. Accordingly, any prejudice suffered by Defendant based on Mr. Santiago's advice was harmless.

Defendant argues that the court's interpretation of the Northern District of Iowa proffer letter kept him from taking the stand. Of course, Mr. Santiago correctly advised him at the time the proffer was signed that, if he took the stand, his proffered statement could be used against him. However, Defendant had many reasons for not taking the stand, including the desire to keep the jurors from learning of his prior criminal history which included a conviction for attempted murder of a police officer. There is no evidence that, had he taken the stand, the outcome of his trial would have been different.

The court, therefore, denies Defendant's request for a new trial based on this assertion of ineffective assistance of counsel.

### 8. *Counsel failed to call Kyle Doolin to testify*

Defendant next asserts that Mr. Santiago was ineffective for failing to call Kyle Doolin to testify before the jury. Apparently, Mr. Santiago chose not to call Kyle Doolin to testify because he was concerned that the government would present the statements made by Defendant in a rebuttal case. Instead, as previously explained in subsection 7, Mr. Santiago called Kyle Doolin to make an offer of proof outside the presence of the jury. Defendant has not shown that Mr. Santiago's tactical decision not to call Kyle Doolin to testify was unreasonable. *See Sanders*, 875 F.2d at 210 (broad latitude to make strategic and tactical choices regarding the appropriate action to take or refrain from taking is afforded when acting in a representative capacity). As discussed above in subsection 7, there is no showing the jury would have acquitted Defendant based on Kyle Doolin's testimony. Accordingly, Defendant's request for a new trial based on this assertion of ineffective assistance of counsel is denied.

### 9. *Counsel's negative attitude*

Defendant contends that Mr. Santiago's negative attitude prejudiced his case. Defendant has failed to show that Mr. Santiago's attitude toward his case was improper or somehow caused his representation to be deficient. Additionally, Defendant has not shown how Mr. Santiago's attitude prejudiced his defense. Mr. Santiago testified that he did not have any "difficulties in the attorney-client relationship" while he was representing Defendant. Without a showing of both prongs of *Strickland*, Defendant has failed to show that Mr. Santiago's attitude caused Defendant to receive ineffective assistance of counsel. Accordingly, Defendant's contention is meritless.

### 10. *Counsel failed to timely file subpoenas*

Defendant asserts that Mr. Santiago failed to timely file subpoena requests for witnesses, "raising the ire of the court and resulting in subpoenas not being issued in time to present witnesses at trial." Local Rule 17.1 provides that subpoenas are to be delivered to the United States Marshal's office at least fourteen days prior to trial. Furthermore, Mr. Santiago was appointed to represent Defendant under the Criminal Justice Act, and Local Rule 17.1 imposes two additional requirements regarding subpoenas for those attorneys appointed under the Criminal Justice Act: (1) private service of process is not permitted for lawyers appointed under the Criminal Justice Act and (2) lawyers appointed under the Criminal Justice Act must file a request for a subpoena with the magistrate judge at least two days before the deadline for delivering the subpoenas to the United States Marshal. As the court noted in the final pre-trial conference, Mr. Santiago was tardy in filing subpoena requests. Defendant, however, has failed to identify the witnesses who were not present due to the tardiness of the subpoenas and has failed to show how his defense was prejudiced. Accordingly, the court denies Defendant's request for a new trial on this ground.

### 11. *Counsel failed to object to testimony from Detective Mark Fisher*

Defendant alleges that he received ineffective assistance of counsel based on Mr. Santiago's failure to object to the introduction of statements that Defendant made to Detective Mark Fisher. Defendant contends that his statements to Detective Mark Fisher should not have been introduced during trial because Detective Mark Fisher was a retired officer. Detective Mark Fisher testified that in July 1998, Defendant contacted him. Defendant requested to speak with Detective Mark Fisher about Defendant's concerns regarding an ongoing investigation. Detective Mark Fisher also explained that he did not retire from the Cedar Rapids Police Department until 2004. Accordingly, when Defendant

spoke with Detective Mark Fisher, he was an active detective with the Narcotics Bureau of the Cedar Rapids Police Department. Therefore, Defendant's assertion is meritless.

### 12. *Counsel failed to object to introduction of a lab report*

Defendant asserts that Mr. Santiago improperly failed to object to the government's introduction of a lab report (Government's Exhibit 2) without benefit of testimony from the chemist who performed the analysis. Mr. Santiago made a tactical decision not to object to the introduction of the lab report. *Sanders*, 875 F.2d at 210 (attorneys have broad latitude to make tactical choices during trial). Furthermore, Defendant has failed to show that he was prejudiced by this evidence. Even without the benefit of the lab report, the government provided sufficient evidence to prove that the substance that Defendant sold to Evangeline Hopkins was, in fact, crack cocaine. Alvin Davis testified that he and Defendant each sold Evangeline Hopkins a $50 rock of crack cocaine. Officer Melissa Henderson also testified that the substance that Evangeline Hopkins purchased from Defendant and provided to the police was crack cocaine. Had Mr. Santiago objected to the introduction of the lab report, the government would have called the proper foundation witness. In the context of the trial, "the fighting issues" did not include the identification and weight of the controlled substances. Accordingly, Defendant's request for a new trial on the basis of this ineffective assistance of counsel claim is denied.

### B. *Trish Miller's Testimony*

Defendant alleges that Trish Miller, a witness that was called on behalf of the government, committed perjury. Defendant "recalls that[,] during [Trish Miller's] testimony in the trial, Trish Miller denied having a plea agreement", but that "the transcript of the final pretrial conference . . . shows that [Trish] Miller had a plea agreement with the United States Attorney's Office." A review of the record indicates that Trish Miller testified at trial that she entered into a plea agreement with the Southern

District of Iowa and pled guilty to conspiracy to distribute cocaine and crack cocaine. Accordingly, Defendant's assertion is meritless.

## C. Lab Report

Defendant asserts that the lab report admitted into evidence by the government failed to provide an adequate description of the substance that was tested. The report noted that the substance was "cocaine base, in the form commonly referred to as crack" but did not define "the form commonly referred to as crack." The Sentencing Guidelines defines "crack" as the street name for "cocaine base" that appears "in a lumpy, rocklike form." The lab report described the substance as an "off-white, rock-like substance," indicating that it was, in fact, crack cocaine and not some other non-crack cocaine base. *See United States v. Stewart*, 122 F.3d 625, 628 (8th Cir. 1997) (holding that the jury properly determined that a substance was crack cocaine based on the cocaine base's rock-like appearance); *United States v. Goodson*, 165 F.3d 610, 615 (8th Cir. 1999) (holding evidence was sufficient to prove that the drugs seized were crack cocaine and not another form of cocaine base). There is no question that the substance provided to the lab by Officer Melissa Henderson was a rock-like substance. Accordingly, Defendant's request for a new trial on this basis is denied.

## D. Sufficiency of the Evidence

In support of Defendant's Supplemental Motion for New Trial, Defendant argues there was insufficient evidence adduced at trial to prove, beyond a reasonable doubt, Defendant's conduct satisfied the elements of each of the offenses with which Defendant had been charged.

### 1. Count 1

The jury was instructed that it could find Defendant guilty of Count 1 under one of three alternatives: (1) conspiring to distribute or possess with intent to distribute 50 grams

or more of "crack cocaine"; (2) conspiring to distribute or possess with intent to distribute 5 grams or more but less than 50 grams of "crack cocaine"; and (3) conspiring to distribute or possess with intent to distribute less than 5 grams of "crack cocaine." Final Jury Instr. No. 14.

In order to prove that Defendant conspired to distribute or possess with intent to distribute 50 grams or more of crack cocaine, the government had to prove:

> *One,*        between about 1995 and 1999, two or more persons reached an agreement or came to an understanding to distribute or possess with intent to distribute "crack cocaine";

> *Two,*        the defendant voluntarily and intentionally joined in the agreement or understanding, either at the time it was first reached, or at some later time while it was still in effect;

> *Three,*     at the time the defendant joined in the agreement or understanding, he knew the purpose of the agreement or understanding; and

> *Four,*      the agreement involved 50 grams or more of "crack cocaine."

Final Jury Instr. No. 14. Additionally, the jury was instructed that Count 1 charges the conspiracy to distribute and possess with intent to distribute crack cocaine and not that the distribution actually occurred. Final Jury Instr. No. 15.

When evaluating a motion for new trial based on allegations that the evidence does not support the verdict, the court "may weigh the evidence and . . . evaluate for itself the credibility of the witnesses." *United States v. Lincoln*, 630 F.2d 1313, 1319 (8th Cir. 1980); *see also United States v. Rodriguez*, 812 F.2d 414, 417 (8th Cir. 1987). A trial court will only set aside a verdict "if the evidence weights heavily enough against the

verdict that a miscarriage of justice may have occurred." *United States v. Lanier*, 838 F.2d 281, 284-85 (8th Cir. 1988).

As detailed in Section III above, the court finds the government presented sufficient evidence at trial to support the jury's conviction of Defendant on Count 1 under the first alternative.

### 2. Count 3

The jury was instructed that, to find Defendant distributed and aided and abetted the distribution of "crack cocaine," the government had to prove:

> *One*, on or about March 18, 1998, the defendant intentionally transferred "crack cocaine" to another person; and
>
> *Two*, at the time of the transfer, the defendant knew that it was a controlled substance, to wit: "crack cocaine."

Final Jury Instr. No. 19. Furthermore, in order to have aided and abetted the commission of a crime, the government had to prove Defendant:

> (1) Knew the crime was being committed or going to be committed; and
>
> (2) Knowingly acted in some way for the purpose of causing, encouraging or aiding the commission of the crime.

Final Jury Instr. No. 20.

As discussed in Section III above, the court finds the government presented sufficient evidence at trial supporting the conviction of Defendant on Count 3.

### E. Prosecutorial Misconduct

Defendant asserts that his conviction was the result of prosecutorial misconduct. Defendant alleges that the prosecutor made an improper reference to his decision not to

testify and failed to give Defendant adequate notice of its intent to call an Illinois State Trooper to testify.

### 1. Prosecutor's statement

Defendant contends that the prosecutor prejudiced his case when he stated: "the only incentive we have to lie here is by the defendant." Defendant alleges that this statement is an improper reference to his failure to testify and in violation of the Fifth Amendment.

In its Resistance, the government asserts that the comment was neither improper nor prejudicial. Additionally, the government notes that any error was cured by the court's instruction to the jury.

The Eighth Circuit Court of Appeals has established a two-prong test for determining whether conduct by a prosecutor constitutes reversible prosecutorial misconduct: (1) the prosecutor's conduct must have been, in fact, improper and (2) the conduct must have prejudicially affected the defendant. *United States v. Plumley*, 207 F.3d 1086, 1094 (8th Cir. 2000); *United States v. Benitez-Meraz*, 161 F.3d 1163, 1166 (8th Cir. 1998). Additionally, when evaluating the prejudicial effect of such misconduct, the court should consider the following: (1) the cumulative effect of the misconduct; (2) the strength of the properly admitted evidence and (3) the curative actions taken by the trial court. *Id.*

It is prosecutorial misconduct for a prosecutor to make a direct or indirect reference to a defendant's failure to testify. *United States v. Triplett*, 195 F.3d 990, 995 (8th Cir. 1999). "Indirect references to a defendant's failure to testify are . . . prohibited if they either (1) manifest the prosecutor's intention to call attention to the defendant's failure to testify, or (2) are such that the jury would naturally have understood them as a comment

on the defendant's failure to testify." *Id*. (citing *Sidebottom v. Deto*, 46 F.3d 744, 759 (8th Cir. 1995)).

The prosecutor's comment was made during rebuttal to Defendant's closing arguments in which Defendant told the jurors that the testimony of the government's witnesses could not be taken as truthful. During closing arguments, Defendant explained that each of the government's witnesses were not credible and had reasons to lie. In the rebuttal argument, the prosecutor stated that Defendant had given law enforcement officers a false name, age, address and employment history when he was arrested in March of 2005. The prosecutor's comment that Defendant was the only one with the incentive to lie was only in response to Defendant's closing arguments and the evidence presented at trial. The prosecutor's comment does not manifest the prosecutor's intention to call attention to Defendant's failure to testify. The statement was not such that a jury would naturally have understood it as a comment on Defendant's decision not to testify.

Furthermore, even if the prosecutor's comment was improper, the court issued the following curative instruction to the jury which ensured Defendant was not prejudiced:

> Members of the jury, during the rebuttal argument of the United States, the prosecutor said, we've heard there's an incentive to lie. The only incentive we have to lie here is by the defendant or words to that effect. You heard defense counsel object to that. And I sustained the objection. Obviously the defendant didn't testify during the trial, and you are instructed to disregard the statement of the prosecutor to the extent that it suggests otherwise. As I previously instructed you in instruction thirteen, there is no burden upon the defendant to prove that he is innocent. Accordingly, the fact that the defendant did not testify must not be considered by you in any way or even discussed in arriving at your verdict.

The court reminded the jury that Defendant's silence does not mean that he could not testify truthfully and that the jury could not consider Defendant's decision not to testify for any reason. Accordingly, Defendant's request for a new trial on this basis is denied.

### 2. *Illinois State Trooper*

Defendant alleges that the prosecutor did not give adequate notice of its intent to call Illinois State Trooper Chad Broyles to testify during trial. There is no suggestion that the information regarding Trooper Chad Broyles's arrest of Defendant and the facts and circumstances surrounding it were not in the discovery file. In Defendant's Motion in Limine filed on August 29, 2005, he requested that the court exclude testimony regarding the stopping of Defendant's vehicle and his subsequent arrest in Illinois. Accordingly, it is clear that Defendant was aware of the government's intent to call Trooper Chad Broyles to testify regarding the traffic stop and arrest. Defendant's assertion to the contrary is meritless. Further, there is no showing of any prejudice to Defendant based on the timing of the notification of Trooper Chad Broyles's testimony.

## VI. CONCLUSION

**IT IS SO ORDERED:**

(1)     The court **DENIES** Defendant Ricardo Watkins's pro se Motion for New Trial (docket no. 218) and

(2)     The court **DENIES** Defendant Ricardo Watkins's Supplemental Motion for New Trial (docket no. 220).


DATED this 1st day of June, 2006.

LINDA R. READE
JUDGE, U. S. DISTRICT COURT
NORTHERN DISTRICT OF IOWA

**Copies mailed on:**   mem  06.01.06

**to counsel of record or pro se parties as shown on docket and other parties listed here:**